UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**MICHAEL SCOTT PIETILA,**

           **Plaintiff,**

v.                                    Case No. 18-CV-1689

**SGT. KEITH IMMERFALL,** *et al.*,

           **Defendants.**

---

### DECISION AND ORDER ON DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Michael Scott Pietila, a Wisconsin prisoner who is representing himself, brings this lawsuit under 42 U.S.C. § 1983. (Docket # 1.) Pietila's claims arise out of a forcible removal from a shower cell. The defendants move for summary judgment on all of Pietila's claims.[1] (Docket # 72.) For the reasons stated below, I will grant the defendants' motion for summary judgment.

### FACTS

*1. Parties*

During the relevant time period, plaintiff Michael Pietila was an inmate at Waupun Correctional Institution. (Docket # 74, ¶ 1.) Pietila suffers from severe mental illness including bipolar I, major depressive disorder, paranoid personality disorder, and post-

---

[1] The defendants also filed a motion to enlarge the time to file a reply brief in support of their motion for summary judgment. (Docket # 79.) Pursuant to Civil Local Rule 56(b)(3), the defendants' reply brief was due November 2, 2020. However, the defendants mis-calendared the deadline for November 13, 2020. They filed this motion on November 9, 2020, and their reply on November 11, 2020. Federal Rule of Civil Procedure 6(b)(1)(B) allows a court "for good cause, [to] extend the time . . . on motion made after the time has expired if the party failed to act because of excusable neglect." I find that the defendants failed to act because of excusable neglect and will grant their motion to enlarge the time to file a reply.

traumatic stress disorder. (Docket # 78, ¶¶ 4-5.) All the defendants were employed at Waupun at that time. (Docket # 74, ¶ 2.) Defendants Patrick Gorman, Grant Roper, Jimmy Mutchie, Jacob Aronson, and Michael Clark were correctional officers. (*Id.*) Brian Schmidt was a sergeant; Keith Immerfall was a lieutenant; and Ann York was a nurse. (*Id.*)

    2. *Extraction from the Shower Cell*

On April 2, 2017, Schmidt informed Immerfall that Pietila was refusing to return to his cell after he finished his shower. (Docket # 74, ¶ 5.) Immerfall went to Pietila's shower cell and asked him why he was refusing to leave. (*Id.*, ¶6.) It is undisputed that Pietila responded by telling Immerfall that he was the governor of Wisconsin and that Immerfall was on an episode of the television show "Undercover Boss." (*Id.*; Docket # 78, ¶¶ 15–16.)

Immerfall states he gave Pietila several directives to come to the front of the shower cell to be restrained so Immerfall could return Pietila to his cell. (Docket # 74, ¶ 7.) Pietila contends that Immerfall gave him only one directive before escalating the situation. (Docket # 77, ¶ 7.) Pietila also states that at that point he was "in full-blown psychosis," and believed that the defendant officers "were going to rape me, murder me, and cannibalize my remains." (Docket # 78, ¶¶ 17-19.) Pietila admits that he believed his refusal to leave the shower cell to be a "contest of wills," but states he viewed it as such because he believed himself to be the governor talking to a subordinate. (Docket # 77, ¶ 9.)

Immerfall states that Pietila was becoming increasingly agitated and posed a security risk for the institution, so he made the decision to assemble a "pad subduing team" to extract Pietila from the shower cell. (Docket # 74, ¶¶ 8, 10–11.) Defendants Roper, Aronson, Mutchie, and Clark comprised the pad subduing team. (*Id.*, ¶ 11.) Defendant Gorman video-recorded the extraction. (*Id.*, ¶ 12.) After the team was assembled and the

2

Case 2:18-cv-01689-NJ   Filed 04/08/21   Page 2 of 16   Document 81

recording started, Immerfall went back to the shower cell door and told Pietila several times to come to the door to be restrained. (*Id.*, ¶¶ 13-14.) Pietila again contends that Immerfall gave him only one directive before escalating the situation. (Docket # 77, ¶ 14.)

Roper then gave Pietila several directives to come to the shower cell door to be restrained, but Pietila refused. (Docket # 74, ¶ 15.) Pietila once again states that Roper gave him only one directive. (Docket # 77, ¶ 15.) At that point, Immerfall told Pietila that he has "MK 9 OC Streamer," which is pepper spray, and that he would use it unless Pietila comes to the door to be restrained. (Docket # 74, ¶ 16.) It is undisputed that Pietila refused to comply. (*Id.*, Docket # 77, ¶ 16.) Immerfall used the pepper spray but states "it did not have the desired effect," as Pietila still refused to come to the door. (Docket # 74, ¶¶ 17–18.) Immerfall again tried to gain Pietila's compliance by displaying the pepper spray and ordering Pietila to come to the door, and when Pietila refused, Immerfall sprayed the pepper spray again. (Docket # 74, ¶¶ 20–21.) The second burst of pepper spray did not subdue Pietila. (*Id.*, ¶ 22.)

It is undisputed that Immerfall then told Pietila several more times to come to the door, and Pietila responded, "I'm not coming out motherfuckers, you'll have to drag me out. You guys think you're tough, you're going to have to work for your bitch ass money today." (Docket # 77, ¶ 23.) At that point, Immerfall authorized the pad subduing team to extract Pietila from the shower cell. (Docket # 74, ¶ 24.)

When the team entered the cell, the defendants state that Pietila "assumed a near seated position on the floor." (*Id.*, ¶ 25.) Pietila states that he was "on my knees, against the back wall with my hands against the wall in a passive and prone position." (Docket # 77, ¶ 25.) Pietila states that any resistance or struggle against the subduing team's attempt to

restrain him was out of "surprise and fear." (Docket # 78, ¶ 24.) He asserts that "it felt like C.O. Aronson was breaking my left arm/wrist," and that Mutchie "threw a punch," which was captured by the video. (*Id.*, ¶¶ 24-25.) Pietila also states that "Roper seemed to be actively trying to wrench or break my neck." (*Id.*, ¶ 26.) Pietila admits that due to his mental state he was rambling and shouting nonsensical things and stated that the subduing team "aggressively and mockingly" responded to his behavior. (*Id.*, ¶ 28.) At that point, Pietila states he began to sob and ask why they were treating him this way. (*Id.*, ¶ 30.)

The defendants state that Pietila was physically resisting the subduing team "by tensing his arms to prevent them from securing them behind his back." (Docket # 74, ¶ 26.) Pietila was also pushing back while twisting his shoulders back and forth and shouting or mumbling. (*Id.*) Aronson and Mutchie secured Pietila's arms using "trained compliance holds." (*Id*, ¶ 27.) Roper then secured Pietila's head "using a trained compliance hold in which an officer encircles the inmate's head using their strong hand to secure the forehead and the opposite hand to secure the chin." (*Id.*, ¶ 28.) According to the defendants, once Roper secured Pietila's head, he became compliant. (*Id.*) The subduing team then restrained Pietila's hands and legs and escorted him to a different shower to rinse off the pepper spray. (*Id*, ¶¶ 29–31.)

3. *Staff-Assisted Strip Search*

After Pietila was allowed to rinse off, Immerfall determined that Pietila needed to be strip-searched to confirm he did not have any contraband and that he was not injured. (Docket # 74, ¶ 41.) Immerfall asked Pietila if he would comply with a strip search and asserts that Pietila refused. (*Id.*, ¶ 42) Pietila contends Immerfall violated Waupun's policy

4

and never asked Pietila to comply with a strip search, and that the only reason Immerfall decided to strip-search him was to humiliate him. (Docket # 77, ¶¶ 41, 43.)

Because Pietila did not consent, Immerfall ordered a staff-assisted strip search, which means that a staff member visually inspects an inmate's body but must occasionally touch him in certain areas like the testicles and buttocks to confirm nothing is hidden in those areas. (Docket # 74, ¶¶ 39–41.) Roper performed the staff-assisted strip search. (*Id.*, ¶ 45.) Roper used dura-shears to cut off Pietila's clothes. (*Id.*) Pietila states that Roper "violently and maliciously rip[ped] some articles off [his] body when he failed to cut through the entire fabric." (Docket # 77, ¶ 46.) Pietila further states that the strip search lasted several minutes, (*id.*, ¶ 47) whereas the defendants contend that it took less 90 seconds (Docket # 74, ¶ 47). Roper further used a "bladed hand" technique to quickly search Pietila's body, including his testicles and buttocks. (*Id.*, ¶ 46.) Pietila does not dispute that Roper used a bladed hand technique but does contend that Roper did not conduct the search quickly. (Docket # 77, ¶¶ 46–47.) He also asserts that the search was conducted in the presence of defendant Anne York, who is female, and who made inappropriate comments about his legs during the search. (*Id.*) He further states that Aronson and Roper were joking around while Roper was conducting the search. (*Id.*) The defendants dispute all of this. (*See* Docket # 80 at 6; Docket # 74, ¶ 55.)

Once the search was completed, Pietila was wrapped in a security kilt and examined by York. (Docket # 74, ¶ 51.) York noted that Pietila had red skin, a runny nose, and a couple of mild scraps to his upper back, but he was not bleeding. (*Id.*, ¶ 53.) Pietila was then taken back to his cell. (*Id.*, ¶ 56.)

5

*4. Video Evidence*

The defendants submitted a video of the encounter. (Docket # 44-2.) The defendants started recording once Immerfall determined he needed to engage the pad subduing team. The video starts with Immerfall summarizing the events leading up to the need to engage the pad subduing team, including the facts that Pietila believed that he was the governor and should be released from custody and that he ignored several directives. (*Id.* 0:00–1:07.) Immerfall and the pad subduing team then approach Pietila's shower cell, and Immerfall asks him to come to the door to be restrained. (*Id.* 1:45–2:14.) Pietila refuses, and Immerfall confirms with the rest of the group that he refused. (*Id.*) Immerfall, in a calm manner, shows Pietila the pepper spray, and explains what it will do. (*Id.*) Pietila and Immerfall have a brief conversation, but the substance of that conversation is unintelligible because there is another inmate shouting. (*Id.*)

Immerfall again calmly asks Pietila to come to the door to be restrained, warning him that if he does not comply, he will be pepper-sprayed and Pietila refuses to comply. (*Id.* 2:14–2:21.) Immerfall gives one final warning and, when Pietila refuses, he sprays the pepper spray into the shower cell. (*Id.* 2:21–3:06.) Immerfall asks Pietila several more times to come to the door to be restrained, and Pietila refuses. (*Id.*) Immerfall warns Pietila he will use the pepper spray again, and when Pietila still not does not comply, Immerfall sprays again. (*Id.*)

Immerfall then repeatedly asks Pietila to come to the door, and Pietila does not comply. (*Id.* 3:06–4:11.) Immerfall offers Pietila several chances to comply before sending in the pad subduing team to extract Pietila from the shower cell. (*Id.*) The pad subduing team cautiously and deliberately enters the shower cell. (*Id.* 4:11–5:52.) Pietila is partially

6

Case 2:18-cv-01689-NJ   Filed 04/08/21   Page 6 of 16   Document 81

obscured by officers standing in front of the camera. (*Id.*) Immerfall can be heard telling Pietila to remain still and to stop resisting. (*Id.*) Another officer tells Pietila to lay flat. (*Id.*) Immerfall and the team's demeanors are firm, yet calm. (*Id.*) While Pietila cannot be seen on camera, it appears that the team is struggling to restrain Pietila. (*Id.*) At one point, after several minutes of trying to restrain Pietila, Immerfall displays a tazer and threatens to use it if Pietila does not stop struggling. (*Id.* at 5:52–7:31.) This appears to work as the officers are then able to successfully restrain Pietila. (*Id.*) The officers' movements through the entire extraction are calm and deliberate. They do not appear to violently wrench Pietila at any point, and no one appears to punch Pietila.

Once Pietila is restrained, the team takes him to a vacant shower cell to rinse off. (*Id.* 7:31–10:15.) Pietila is not resisting, but he is visibly upset, mumbling about how he is the governor, and calling the team various obscenities. (*Id.*) The team moves Pietila slowly and carefully. (*Id.*) After Pietila rinses off, he is escorted to a strip cell area, where he is restrained. (*Id.*) While Pietila is being moved, Immerfall orders someone to get the dura-sheers. (*Id.*)

When Pietila is secured, someone announces that they will be conducting a staff-assisted strip search. (*Id.* at 10:15–11:30) Pietila is still visibly upset and mumbling incoherently. (*Id.*) No one appears to ask Pietila if he would consent to a strip search. (*Id.*) Roper cuts Pietila's clothes off with the dura-sheers, but occasionally Roper struggles with the sheers, so he rips through the clothing. (*Id.*) The ripping is done carefully and is not violent. (*Id.*) It takes Roper several minutes to remove Pietila's clothing. (*Id.* at 11:30–16:35.) At one point, a female voice off-camera can be heard saying "as quiet as a church mouse." (*Id.* at 11:30–11:45.)

7

Roper then explains to Pietila that he is going to search him, and Pietila starts crying. (*Id.* 16:35–18:12.) The search lasts less than 90 seconds, and Roper verbalizes what he is doing in a calm manner the entire time. (*Id.*) Pietila becomes very upset when Roper searches between his buttocks. (*Id.*) Neither Roper nor anyone else jokes during the removal of Pietila's clothes or during the search. (*Id.*)

Once the search is over, the team struggles to cover Pietila with a security kilt, not because of Pietila's actions, but because there are issues with the kilt. (*Id.* at 18:59–22:23.) While the team is attempting to cover Pietila, a female voice can be heard off camera. Much of what she says is unintelligible, but at one point she asks, "Are you ready for me?" (*Id.*)

Nurse York then appears and examines Pietila. (*Id.* at 20:23–24:14.) She checks his vitals, his lungs, and assesses him for injuries. (*Id.*) She does not make any comments that are not directly related to the examination. (*Id.*) Once Nurse York completes her examination, the team calmly and carefully escorts Pietila to his cell without further incident. (*Id.* 24:14–end.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

8

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Pietila proceeds on the following Eighth Amendment excessive force claims: (1) a claim against defendant Sgt. Keith Immerfall for using pepper spray on him and ordering a team of guards to forcibly remove Pietila from the shower cell; (2) a claim against defendants Jacob Aronson, Jimmy Mutchie, Grant Roper, and Michael A. Clark for forcibly removing Pietila from the shower cell; and (3) a claim against defendants Immerfall, Brian Schmidt, and Patrick Gorman for failing to intervene in the forcible removal of Pietila from the shower cell. Pietila was also allowed to proceed on an Eighth Amendment claim against Roper for an inappropriate strip search and against defendants

9

Immerfall, Schmidt, Gorman, and York[2] for failing to intervene to stop the strip search. The defendants move for summary judgment on all claims. I will address each in turn.

1. *Eighth Amendment Excessive Force Claims*

Pietila brings claims of excessive force against Immerfall for using pepper spray and ordering the pad subduing team to extract him from his cell and against the pad subduing team—Aronson, Mutchie, Clark, and Roper—for their extraction of Pietila from the shower cell. He also claims that Immerfall, Schmidt, and Gorman failed to prevent the subduing team from using excessive force against him.

Under the Eighth Amendment, correctional officers violate an inmate's constitutional rights "when they use force 'maliciously and sadistically for the very purpose of causing harm,' but not when they apply it in good faith to maintain or restore discipline." *Jackson v. Angus*, 808 Fed. Appx. 378, 382 (7th Cir. 2020) (quoting *Hudson v. McMillian*, 503 U.S. 1, 6 (1992)). "Whether a guard applies force in good faith to resolve a disturbance or, rather, maliciously with intent to cause harm, turns on factors including the threat reasonably perceived by the guard, the need for and the amount of force used, and the injury suffered by the prisoner." *Boyd v. Pollard*, 621 Fed. Appx. 352, 355 (7th Cir. 2015). Also, where officers are able to step in and prevent a constitutional violation but fail to do so, they may be held liable. *See Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005).

Prior to being pepper-sprayed, Pietila claims that he was given only one order by both Immerfall and Roper to comply before they sprayed him. However, the video clearly

---

[2] Defendants state the court did not screen Pietila's amended complaint to allow Pietila to proceed on the failure to intervene claim against York. (Docket # 73 at 3.) However, the court did screen the amended complaint in its order dated April 7, 2020, clearly stating that Pietila states a claim "against defendant Immerfall, Schmidt, Gorman, and York [for] allegedly fail[ing] to intervene in the strip search" and directed the defendants to answer the amended complaint. (Docket # 60 at 1–2.)

10

contradicts this, showing that Pietila was given several chances to comply before Immerfall used the pepper spray both times. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on summary judgment." *See Scott v. Harris*, 550 U.S. 372, 378 (2007). The use of pepper spray is justified when an inmate refuses to comply with orders to come out of a cell, s*ee Jackson*, 808 Fed. Appx. at 382 (citing *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 668 (7th Cir. 2012)), thus, no reasonable jury could conclude that Immerfall's use of the pepper spray rose to the level of a constitutional violation.

Nor could a reasonable jury conclude that Immerfall's decision to use a pad-subduing team to extract Pietila from his cell was excessive force. Pietila was refusing to comply with Immerfall's orders even after being sprayed with pepper spray twice. As Immerfall's introduction to the video shows, the decision to use the pad subduing team was made in good faith to restore discipline. Pietila argues that because he was experiencing a mental-health episode, cell-extraction was too extreme of an option. However, Pietila also admits that he saw the interaction as a "contest of wills" and was willfully resisting orders. His reasons for his actions have no bearing on whether the cell-extraction was excessive. In fact, his mental instability suggests that Pietila posed a risk to himself and others and further justifies Immerfall's decision to extract him from the shower cell.

Also, no reasonable jury could conclude that the pad subduing team used excessive force in extracting him from his cell. Pietila asserts that he was in a "passive" position, and that he was not significantly struggling. He also states that Aronson twisted his arm so much it felt like he was breaking it; that the video shows Mutchie "threw a punch," and that

11

Roper was "actively trying to wrench or break my neck." (Docket # 78, ¶¶ 24–25.) While the view of Pietila is obscured in the video, the video still shows the demeanor of the officers. The video does not show Mutchie or anyone else throwing a punch as Pietila contends. To the contrary, the video shows that Pietila was struggling significantly—to the point where four officers could barely contain him—while the officers were speaking and moving deliberately and cautiously. Additionally, the video shows that Pietila did not stop struggling until Immerfall displayed a tazer. In short, the video shows that the amount of force used was the amount necessary to subdue Pietila into compliance and was not used in a punitive manner. Such force does not rise to the level of a constitutional violation. *Bowers v. Pollard*, 345 Fed. Appx. 191, 197 (7th Cir. 2009) (finding no constitutional violation where video evidence clearly shows that the force used was not punitive in nature). Because the pad-subduing team's actions do not rise to the level of an Eighth Amendment violation, no reasonable jury could conclude that Immerfall, Schmidt, and Gorman violated Pietila's rights when they failed to intervene. *See Harper*, 400 F.3d at 1064. Accordingly, Immerfall, Aronson, Mutchie, Clark, Roper, Schmidt, and Gorman are granted summary judgment in their favor on these claims.

2. *Eighth Amendment Claims Related to the Strip Search*

Pietila also claims that Roper violated his Eighth Amendment rights when he conducted the strip search, and that Immerfall, Schmidt, Gorman, and York violated his rights when they failed to intervene to stop the strip search. "The Eighth Amendment prohibition on cruel and unusual punishment bars prison authorities from unnecessarily and wantonly inflicting pain on inmates." *Rivera v. Drake*, 497 Fed. Appx. 635, 637 (7th Cir. 2012). Specifically, "[i]n the context of searches of prisoners, only searches that are

12

maliciously motivated, unrelated to institutional security, and lack a legitimate penological justification violate the Eighth Amendment." *Id*. This includes a prison official "performing some action that is 'intended to humiliate the victim or gratify the assailant's sexual desires.'" *Gills v. Pollard*, 554 Fed. Appx. 502, 505 (7th Cir. 2014) (quoting *Washington v. Hively*, 695 F.3d 1044, 1046 (7th Cir. 2012)).

Pietila asserts that Immerfall did not ask him if he would comply with a strip search and instead decided to go forward with a staff-assisted strip search for the sole purpose of humiliating Pietila. Immerfall contends he did ask him and states that a search was necessary to determine that Pietila did not have any contraband and to assess whether he was injured. Those are legitimate penological justifications. Pietila offers nothing more than his bald assertion that he believes Immerfall ordered the search to humiliate him. Bald assertions that are not bolstered by more specific evidence are insufficient to create a genuine issue of material fact. *Drake v. Minn Mining & Mfg Co.*, 134 F.3d 878, 887 (7th Cir. 1998). At most, Pietila points to the fact that Immerfall failed to follow policy when he did not ask him if he would comply with a search; that Nurse York was present during the strip search and made comments about his legs; and that Roper and Aronson were joking around during the search.

Regarding Immerfall's failure to follow policy, the video confirms that Pietila is correct that Immerfall did not ask Pietila if he would comply with a strip search. However, without additional evidence of a constitutional violation, an officer who fails to follow policy cannot be held liable under § 1983 solely for the violation of that policy. *See Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003). And merely failing to follow policy does not render the strip search malicious or without penological justification.

13

Regarding York's presence during the search, the video confirms her presence, but this alone does not render the search unconstitutional. *See Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003) ("[T]he strip search of a male prisoner in front of female officers, if conducted for a legitimate penological purpose, would fail to rise to the level of an Eighth Amendment violation.") While York is heard commenting that Pietila is "quiet as a church mouse," it did not capture any inappropriate comments about his body or, more specifically, his legs. Thus, the video once again contradicts Pietila's story. There is no evidence in the record suggesting that York's presence during the search rose the level of an Eighth Amendment violation.

Also, no reasonable factfinder could conclude that Roper conducted the search in a malicious or humiliating manner. Pietila asserts that Roper "violently and maliciously rip[ped] some articles off [his] body when he failed to cut through the entire fabric." He also asserts that Roper and Aronson were joking around. However, the video demonstrates that while Roper did have to rip off certain articles of clothing, it was because the dura-sheers were not working, and it was more efficient to tear the clothing. The video also clearly shows that when Roper ripped Pietila's clothes, it was not done in a violent or malicious manner. Additionally, the video does not show that Roper was joking around with anyone. Thus, the video contradicts Pietila's version of the facts and shows that the strip search was conducted for legitimate penological purposes and was not done in a malicious manner. As such, summary judgment is granted in favor of Roper on the Eighth Amendment claim. Because no reasonable jury could conclude that the strip search violated Pietila's Eighth Amendment rights, no reasonable jury could conclude that Immerfall, Schmidt, Gorman, and York violated Pietila's rights when they failed to intervene in the strip search. *See*

*Harper*, 400 F.3d at 1064. The court grants summary judgment in favor of Roper, Immerfall, Schmidt, Gorman, and York on these claims.

## CONCLUSION

Summary judgment is granted in the defendants' favor on all claims because no reasonable jury could find that Pietila was subjected to excessive force or that the strip search was conducted for a malicious and humiliating purpose. The defendants also argued that they were entitled to qualified immunity. Because the court grants summary judgment on the merits, the court does not need to address the qualified immunity argument.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motion to enlarge time to file a reply brief in support of their renewed motion for summary judgment (ECF No. 79) is **GRANTED.**

**IT IS FURTHER ORDERED** that the defendants' motion for summary judgment (ECF No. 72) is **GRANTED.**

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case

Dated at Milwaukee, Wisconsin this 8th day of April, 2021.

BY THE COURT:

NANCY JOSEPH
United States Magistrate Judge